# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Derek J. Walsh | ) | |
|        Plaintiff, | ) | Case No. 1: 14-cv-03412 |
| | ) | |
|        v. | ) | Judge George M. Marovich |
| | ) | |
| Kaluzny Bros. Inc., Peter Kaluzny, Unknown | ) | |
| Kaluzny Bros. Inc. Employees, Officer John S. | ) | |
| Huizenga, Police Chief Robert J. Dykstra, | ) | |
| Unknown Rockdale Police Officers, and the | ) | |
| Village of Rockdale, | ) | |
|        Defendants. | | |

## FIRST AMENDED COMPLAINT

Plaintiff Derek J. Walsh ("Walsh"), by and through his attorneys, Winston & Strawn LLP, states as follows:

## NATURE OF THE ACTION

1. This is an action brought by Walsh to recover for violation of his Fourth Amendment right to be free from unlawful seizures and other wrongs committed by Defendants.

2. Walsh was a model employee at Kaluzny Bros., Inc. ("Kaluzny Bros.") and was so well-liked and respected by his co-workers that he was named union steward and served as a liaison between Kaluzny Bros.' management and Kaluzny Bros.' employees. Defendant Kaluzny Bros. and its management including but not limited to Defendant Peter Kaluzny did not like Walsh because he had the gall to fight for Kaluzny Bros.' employees' rights. As a result, Kaluzny, Thomas George, plant manager at Kaluzny's, and other Defendant Unknown Kaluzny Bros. Employees hatched a scheme to get rid of Walsh.

3. Specifically, Kaluzny and George exploited the Kaluzny Bros.' close relationship

with the Rockdale Police Department (the "Rockdale Police") and falsely accused Walsh of stealing copper wire from Kaluzny Bros. The Rockdale Police, including, but not limited to, Defendants Officer John S. Huizenga ("Officer Huizenga") and Police Chief Robert J. Dykstra ("Chief Dykstra") were willing to help out Kaluzny and Kaluzny Bros. by relying on statements from Kaluzny and George that they knew to be false, conducting a deliberately incomplete investigation, and causing Walsh to be arrested twice on January 31, and February 1, 2013, respectively, without probable cause. Walsh was then required to spend nine months fighting the false charges which resulted in the trial court concluding that there was not even enough evidence to establish that a crime was committed, let alone evidence that Walsh stole copper wire from Kaluzny Bros.

4.     Walsh asserts two Section 1983 claims based on the January 31, and February 1, 2013 false arrests (Counts I and II), a Section 1983 claim for conspiracy between the individual Defendants (Count III), a state law claim for malicious prosecution against Kaluzny and Kaluzny Bros., Officer Huizenga, Chief Dykstra, Unknown Rockdale Police Officers, and the Village of Rockdale (Count IV), and a state law indemnity claim pursuant to 745 ILCS 10/9-102 against the Village of Rockdale.

## JURISDICTION

5.     Walsh brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law that deprived Walsh of his right to be free from an unreasonable seizures pursuant to the Fourth Amendment to the U.S. Constitution.

6.     This Court has original jurisdiction over Walsh's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

7.     This case also arises under the state laws of the State of Illinois. This court has

supplemental jurisdiction over Walsh's state law claims under 28 U.S.C. § 1367(a).

## VENUE

8.      Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division, a judicial district in which a substantial part of the events giving rise to Walsh's claims occurred and in which a Defendant resides or conducts business.

## PARTIES

9.      Walsh is a citizen and resident of Will County, Illinois.  Walsh was employed by Defendant Kaluzny Bros. from January 2012 until he was fired in February 2013.

10.     Kaluzny Bros. is an Illinois corporation with its principal place of business in Rockdale, Will County, Illinois.  Kaluzny Bros. is in the business of recycling animal bi-products and cook oils into feed stocks.   Upon information and belief, Kaluzny Bros. has operated in Rockdale for over sixty years and is one of the largest employers in Rockdale.

11.     Upon information and belief, Kaluzny is a citizen and resident of Grundy County, Illinois.  Kaluzny is the maintenance supervisor at and a part owner of Defendant Kaluzny Bros. Kaluzny made the initial report of the theft to the Rockdale Police and made knowingly false statements to the Rockdale Police that led to Walsh being false arrested on January 31, and February 1, 2013, respectively.

12.     Defendant Unknown Kaluzny Bros. Employees are unknown agents, servants and/or employees of Kaluzny Bros.

13.     At all times relevant hereto, Kalunzy and Unknown Kaluzny Bros. Employees were acting within the scope of their employment with Kaluzny Bros.

14.     Defendant Officer Huizenga is a patrolman at the Rockdale Police and was the

lead investigator in the investigation that led to Walsh's false arrests on January 31, and February 1, 2013, respectively.

15. Defendant Chief Dykstra is the Chief of Police at the Rockdale Police. Upon information and belief, Chief Dykstra took the rare step of getting personally involved in the criminal investigation of Walsh. Chief Dykstra also approved all of Officer Huizenga's reports, and Officer Huizenga's decision to arrest Walsh on January 31, and February 1, 2013, respectively.

16. Defendant Unknown Rockdale Police Officers are unknown officers, agents, servants and/or employees of the Rockdale Police.

17. At all times relevant hereto, Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers were acting under color of law, within the scope of their employment, and pursuant to and furtherance of statutes, ordinances, regulations, customs, polices and usages of Defendant Village of Rockdale and the Rockdale Police. Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers are sued in their individual and official capacities.

18. Defendant Village of Rockdale is a municipal corporation in Will County, Illinois. As of the 2010 Census, the Village of Rockdale has approximately 2,000 residents and is less than a square mile large. The Village of Rockdale operates a police department in Rockdale, Illinois.

## UNDERLYING FACTUAL ALLEGATIONS

I. **Kaluzny Bros. Hires Walsh, and Walsh Quickly Earns the Respect of His Fellow Employees.**

19. In January 2012, Kaluzny Bros. hired Walsh to work as a press operator. As a press operator, Walsh ran the machines that recycled the animal bi-products and cook oils and were at the heart of Kaluzny Bros.' operations. Walsh worked the second shift at Kaluzny Bros.

five to six days a week. The second shift typically lasted from eight to twelve hours.

20. At around the time Walsh began working for Kaluzny Bros., he joined the union many of his fellow co-workers were members of: The United Food and Commercial Workers, Local 1546 ("UFCW").

21. Walsh quickly became a highly skilled press operator and was a model employee.

22. Walsh also rapidly became well-liked and respected by his co-workers.

23. Walsh was so well-liked and respected by his co-workers that he was named acting union steward by his UFCW member co-workers in or around August 2012. As union steward, Walsh served as a liaison between UFCW members at Kaluzny Bros. and Kaluzny Bros.' management, and became heavily involved in all UFCW-related activities at Kaluzny Bros.

**II. Kaluzny Bros. Becomes Angered by Walsh's Involvement in the Union.**

24. Shortly after Walsh became acting union steward, the UFCW was in contract negotiations with Kaluzny Bros.

25. Walsh believed that the contract being offered by Kaluzny Bros. was not a fair agreement to its employees.

26. Walsh began posting signs and leaflets in the worker break and locker room urging his UFCW member co-workers to reject the contract being offered by Kaluzny Bros. He also posted news articles from the Daily Herald regarding the strike taking place at the time at a Caterpillar, Inc. plant in nearby Joliet, Illinois. The worker break and locker room was the only room at Kaluzny Bros. in which union activities could take place.

27. Walsh also had numerous conversations with his UFCW member co-workers in which he urged them to reject the contract being offered by Kaluzny Bros.

28.     Upon information and belief, Walsh's conduct angered management at Kaluzny's Bros., including but not limited to Kaluzny and George.[1]

29.     George ripped down the signs, leaflets and news articles Walsh posted and at one point told Walsh that he "didn't want this shit in his locker room" and falsely stated that Walsh was creating a "hostile work environment."

30.     Despite the intimidation efforts by Kaluzny Bros., Walsh convinced his UFCW member co-workers to reject Kaluzny Bros.' contract offer in October or November 2012.

31.     Shortly thereafter, Walsh got his UFCW member co-workers to hold a meeting outside of Kaluzny Bros. to discuss the possibility of a strike, which is the first step UFCW must take before going on strike.  At the meeting, they agreed to continue negotiating with Kaluzny Bros., but that if Kaluzny Bros. did not significantly improve its contract offer, they would go on strike.

32.     Upon information and belief, Kaluzny and others in Kaluzny Bros.'s management became aware of the UFCW meeting and were deeply concerned that its UFCW member workers would go on strike.  Upon information and belief, Kaluzny Bros. had never had a strike in its sixty plus-year history or even had its union workers call a meeting to discuss the possibility of a strike.

33.     Shortly after the meeting, Kaluzny Bros. made a second contract offer.  Walsh again urged his UFCW member co-workers to reject the contract through the posting of leaflets and posters and conversations with his UFCW co-workers.  George again took down leaflets and posters Walsh posted.

---

[1] George is now deceased.  At all times relevant hereto, George was the plant manager at Kaluzny Bros. and was acting within the scope of his employment at Kaluzny Bros.

34.     Despite Walsh having the right to post the leaflets and posters in the Kaluzny Bros.' worker break and locker room, George also asked Walsh at one point to take down the leaflets and posters Walsh posted.  Walsh was then left with little choice but to file a grievance with the Kaluzny Bros.' management pursuant to the operative contract between the UFCW and Kaluzny Bros., and Walsh did so upon information and belief prior to mid-December 2012.

35.     Over Walsh's objection and by a majority vote, his UFCW member co-workers voted to approve the Kaluzny Bros. contract in approximately mid-December 2012.  While his UFCW member co-workers decided to approve the contract despite Walsh's objection, they appreciated how hard Walsh fought for their rights and voted Walsh as the permanent union steward.

36.     Upon information and belief, Kaluzny, George, and other Unknown Kaluzny Bros. Employees became deeply concerned by Walsh's election to union steward.  Specifically, and upon information and belief, they were deeply concerned that he would vigorously advocate for his UFCW member co-workers' rights and would not merely acquiesce to the Kaluzny Bros.' management desires and decisions.

**III.     A Missing Wooden Spool of Copper Wire Provides Kaluzny Bros. the Opportunity to Get Rid of Walsh.**

37.     On January 2, 2013, Kaluzny noticed a wooden spool of copper wire missing from a boiler room at Kaluzny Bros.

38.     The boiler room was unlocked and anyone on the grounds of Kaluzny Bros. would have access to the boiler room.

39.     Further, the wooden spool was a few hundred pounds, making it very difficult for someone to pick it up, put in his or her car, transport it off the Kaluzny Bros.' premises, and do so without anyone noticing.

40.     As a result, Kaluzny did not suspect as of January 2, 2013, that the wooden spool had been stolen and did not call the Rockdale Police at that time.

41.     Kaluzny enlisted George to determine the location of the wooden spool.

42.     George then spoke with Kaluzny Bros. employees including Andrew Smith and asked them to "keep an eye out."

43.     A little less than a week after George spoke with Smith, Smith relayed a conversation he had with Walsh.  According to Smith, Walsh stated that scrap yards are "sticklers" about taking in scrap.  Smith asked Walsh if he had tried All American Recycling in Joliet.  Walsh responded that "he had copper" and that Lemont Scrap paid the most for copper.

44.     Upon information and belief, George and Kaluzny saw this vague statement as their opportunity to get rid of Walsh and ensure that the UFCW would not be causing problems at Kaluzny Bros.

45.     But they needed more than just Smith's vague statement to get rid of Walsh. Under the UFCW contract with Kaluzny Bros., an employee such as Walsh could only be fired for cause.  As a result, and upon information and belief, Kaluzny and George decided to exploit the Kaluzny Bros.' close relationship with the Rockdale Police to get Walsh charged with a crime, which would provide the necessary pretext to fire Walsh.

46.     Upon information and belief, this close relationship was developed because Rockdale is a small town, Kaluzny Bros. has been in business in Rockdale for over sixty years, and Kaluzny Bros. is one of the largest employers in Rockdale.

47.     Walsh witnessed during his employment at Kaluzny Bros. Unknown Rockdale Police Officers having coffee and/or socializing with Kaluzny, George, and other Unknown Kaluzny Bros. Employees on multiple occasions.

48.     Kaluzny began the scheme to use the Rockdale Police to get rid of Walsh by calling them on January 11, 2013, to report the theft of a wooden spool of copper wire.

**IV.     The Rockdale Police Conducts a Deliberately Flawed Investigation.**

49.     Officer Huizenga responded to the call on the same day and met with Kaluzny and George.  Kaluzny told Officer Huizenga that the stolen copper wire was approximately three inches wide and flat with black insulation and inside of the black insulation was four individual copper cables that had four different colors of insulation: yellow, red, black, and green, respectively.

50.     George then relayed to Officer Huizenga the conversation that he had with Smith in order to ensure that the Rockdale Police would focus their investigation on Walsh.

51.     After speaking with Kaluzny and George, Officer Huizenga spoke with Amy Tuttila at Lemont Scrap.  Officer Huizenga provided a description of Walsh's car.  Tuttila then provided Officer Huizenga with a photograph of Walsh's car and a copy of the invoice for the scrap brought in by Walsh.  The picture that Lemont Scrap provided of Walsh's truck is shown below:



52.     As is shown in the picture above, Walsh's truck contains nondescript black and blue barrels.

53.     Tuttila also provided Officer Huizenga with the following picture of the scrap brought in by Walsh:



54.     As is shown in the picture above, the picture does not show the copper wire described by Kaluzny to Officer Huizenga on January 11, 2013.  Specifically:

    a.      It is not on a spool.

    b.      It is not approximately three inches wide and flat with black insulation and inside that insulation, four individual copper wires with the colors: yellow, red, black, and green, respectively.

    c.      It is impossible to tell the exact colors of the copper wires.  The wires could be (from top to bottom): green or blue; red or orange; and black or blue.

    d.      Finally, there is no distinguishing characteristics in the copper wire above.

55.     Officer Huizenga showed Kaluzny and George the above photos in mid to late January 2013.

56.     Kaluzny and George knew that it was impossible to tell based on the above photos that the copper wire and blue barrel, in fact, belonged to Kaluzny Bros.  Despite that, Kaluzny and George deliberately and falsely stated that the copper wire in the photo was the copper wire stolen from Kaluzny Bros. and that the blue barrel in Walsh's car belonged to Kaluzny Bros.

57.     Officer Huizenga knew Kaluzny and George's statements were false because he also knew that it was impossible for anyone to tell whether the copper wire and blue barrel, in fact, belonged to Kaluzny Bros.

58.     Upon information and belief, Chief Dykstra learned of Kaluzny and George's statements in mid to late January 2013.  When Chief Dykstra learned of those statements, he also knew that Kaluzny and George's statements were false for the same reason set forth in Paragraph 57.

59.     Officer Huizenga and Chief Dykstra deliberately ignored the falsity of Kaluzny and George's statements because, upon information and belief, the close relationship that existed between the Rockdale Police and Kaluzny Bros.

60.     After speaking with Kaluzny and George, on January 23, 2013, Smith came to the Rockdale Police Station and provided a written statement similar in substance to the information set forth in Paragraph 43 above.

61.     In the days after Officer Huizenga had spoken with Kaluzny and George and received a written statement from Smith, Chief Dykstra became directly involved in the investigation.  Upon information and belief, Chief Dykstra rarely gets personally involved in Rockdale Police criminal investigations, but choose to do so here due to the close relationship between the Rockdale Police and the Kaluzny Bros.

62.      On January 30, 2013, Chief Dykstra made contact with Tyrone Smego, who's

name appeared on the invoice provided by Tuttila. Upon information and belief, Chief Dykstra placed Smego under arrest and caused him to be transported to the Rockdale Police Station.

63.     Upon information and belief, once at the Rockdale Police Station, an Unknown Rockdale Police Officer handcuffed Smego to a table in an interrogation room. Once handcuffed to the table, Officer Huizenga and Chief Dykstra pressured Smego to make a statement and refused to let him go until he did so.

64.     Smego relented to Officer Huizenga and Chief Dykstra's pressure and made the following statement:

> Dareck [sic] came to my house with Truck of wire found in ally [sic]. Ask [sic] me to us [sic] my ID at Lemont Scrap. Then tells me a uncle gave [it] to him to work off the money. Received 492$^{00}$ Approx in check. I whent [sic] to bank [sic] I gave cash to Derack [sic], Approx 30 days ago.

65.     Once Smego made this statement, they uncuffed him and allowed him to leave.

66.     Upon information and belief, Officer Huizenga and Chief Dykstra deliberately omitted from their police reports that Smego was arrested and not released until he made a statement to them.

67.     As of January 30, 2013, the only "evidence" that the Rockdale Police had against Walsh was (1) the false statements from Kaluzny and George identifying the copper wire and a blue barrel in photos from Lemont Scrap as Kalunzy Bros.' property that Officer Huizenga and Chief Dykstra knew to be false; (2) the vague written statement from Smith that Walsh "had copper" and Lemont Scrap were "sticklers"; and (3) the vague written statement from Smego that Walsh said he found the copper wire in the alley but then later said he got it from his uncle.

68.     The Rockdale Police had no witnesses that actually saw Walsh with the copper wire from Kaluzny Bros., and they had no witnesses that saw Walsh remove the wire from

Kaluzny Bros. In short, the Rockdale Police had no evidence that Walsh had stolen copper wire from Kaluzny Bros.

69. In fact, the Rockdale Police had no evidence that copper wire was, in fact, stolen from Kaluzny Bros. as opposed to just being misplaced by a Kaluzny Bros.' employee.

70. Upon information and belief, Officer Huizenga knew from his conversations with Kaluzny and George that Kaluzny Bros. had security cameras throughout its premises. Additionally, upon information and belief, Officer Huizenga knew about the security cameras because they were readily apparent on the Kaluzny Bros.' premises. Nonetheless, Officer Huizenga never asked anyone at Kalunzy Bros. to review the security footage because he knew it would not show anyone stealing the copper wire let alone Walsh.

71. Upon information and belief, Officer Huizenga also knew from his conversations with Kaluzny and George that Kaluzny Bros. employed security guards to monitor the Kaluzny Bros.' premises. Additionally, upon information and belief, Officer Huizenga knew that Kaluzny Bros. employed security guards because they were readily apparent on the Kaluzny Bros.' premises. Nonetheless, Officer Huizenga deliberately decided to not speak with any of the security guards because he knew that none of them had seen anyone stealing copper wire let alone Walsh.

**V. Despite a Complete Lack of Evidence, the Rockdale Police Arrest Walsh on January 31, 2013.**

72. Knowing that they had no evidence implicating Walsh in the alleged theft and upon information and belief, Officer Huizenga and Chief Dykstra hoped to extract a false confession out of Walsh.

73. Officer Huizenga called Walsh's girlfriend, Trishianna Williams, on January 30, 2013, telling her that he [Officer Huizenga] needed to speak with Walsh.

74.     The next day, Walsh showed up at the Rockdale Police Station, where he made contact with Officer Huizenga.

75.     Officer Huizenga escorted Walsh to an interrogation room and handcuffed Walsh to the interrogation table.  Officer Huizenga then left the interrogation room and locked the door.  Because of all this, Walsh was not free to leave the interrogation room.

76.     Walsh was left in the interrogation room for approximately an hour.  After an hour or so, Officer Huizenga came back into the room and placed a form in front of him entitled, "Statement of Constitutional Rights and Waiver," asking Walsh to waive his *Miranda* rights.

77.     Walsh then wrote the word "NO" on the form and handed it back to Officer Huizenga.  In response, Officer Huizenga was incredulous, stating, "What do you mean, no!?"  Walsh explained to Officer Huizenga that he was not waiving his *Miranda* rights.  Officer Huizenga then left the room and closed the door.  Walsh was still handcuffed to the interrogation table and not free to leave.

78.     Approximately one hour later, Chief Dykstra came into the interrogation room and attempted to pressure Walsh to falsely incriminate himself, stating, "You're refusing to speak with us?!  We were going to charge you with a misdemeanor with a $100 bond, but now we're going to charge you with a Class 4 felony."  Chief Dykstra then told an Unknown Rockdale Police Officer to "leave him in there [the interrogation room]."

79.     Despite Chief Dykstra's threats, Walsh continued to exercise his constitutional right to not speak with the Rockdale Police and maintained his silence.

80.     Walsh remained handcuffed to the table and was again not free to leave.

81.     Approximately an hour passed, and Officer Huizenga and Chief Dykstra returned to the interrogation room.  Officer Huizenga uncuffed Walsh, and Chief Dykstra threatened

Walsh that he was "going to walk a warrant through the courthouse." Walsh was then released at that time.

82. To cover up their wrongful conduct, Officer Huizenga and Chief Dykstra falsely stated in their reports that Officer Huizenga immediately escorted Walsh from the Rockdale Police Station when Walsh decided to invoke his *Miranda* rights.

83. Chief Dykstra made good on his threat by having Officer Huizenga go to the Circuit Court of Will County to obtain an arrest warrant on February 1, 2013, based on the false and otherwise knowingly flawed "evidence" set forth above. The Rockdale Police obtained no further evidence against Walsh between the time he was arrested on January 31, 2013, and February 1, 2013.

84. The court signed the arrest warrant on February 1, 2013.

85. At the direction of Chief Dykstra, Officers Robert D. Baikie and Matthew Bowes executed the arrest warrant and arrested Walsh at his home on February 1, 2013. Walsh was placed in handcuffs and transported to the Will County Adult Detention Center ("WCADC").

86. Walsh was charged with two counts of felony theft.

87. Walsh had to spend approximately nine (9) days in the WCADC for a crime he did not commit and for which the Rockdale Police did not have probable cause to charge him. Walsh was finally released after he was able to post a bond.

**VI. Kaluzny Bros. Get Their Pretext to Fire Walsh.**

88. With Walsh criminally charged with felony theft, Kalunzy, George and Unknown Kaluzny Bros. Employees finally had their pretext to fire Walsh with cause.

89. When Walsh returned to work on February 11, 2013, after he was released from the WCADC, Walsh met with, upon information and belief, Dave Kaluzny, another part owner

of Kaluzny Bros., and George. At this meeting, Dave Kalzuny and George informed Walsh that he was fired because he purportedly stole copper wire from Kaluzny Bros.

90.     When Walsh was fired, he lost his main source of income.

91.     Walsh was also required to expend money to hire an attorney to defend him on the false charges brought against him.

**VII.    The Case Against Walsh Predictably Falls Apart.**

92.     Nine months later, on November 13, 2013, Walsh's theft trial began before the Honorable Edward Burmila.

93.     At Walsh's trial, the complete lack of evidence against Walsh was exposed.

94.     Kalunzy contradicted his prior statement to Officer Huizenga and admitted that he was not sure if the copper wire in the photo shown to him by Officer Huizenga was in fact from Kaluzny Bros.

95.     Judge Burmila recognized the inherent flaw in any supposed identification of the copper wire being from Kaluzny Bros., stating, "I don't know that there would anything so unique about the blue and red wire that would lead ***anybody*** to believe that it necessarily came from the original source [Kaluzny Bros.]." (Emphasis added).

96.     Kaluzny further contradicted his prior statement to Officer Huizenga by admitting that the blue barrel in Walsh's car in the photo shown to him by Officer Huizenga could "only possibly" be from Kaluzny Bros. He admitted that he could not say for sure whether the barrel came from Kaluzny Bros. because the barrel was not unique to Kalunzy Bros. He additionally admitted that he did not even know if a blue barrel was missing from Kaluzny Bros.

97.     Smith repeated much of his earlier vague statement that Walsh asked him where there was a good place to scrap copper and that Lemont Scrap pays the most.

98.     George testified that Smith came forward and told him about Walsh's statement.

99.     Smego repeated his earlier vague statement that Walsh first told him that he found the copper on the street and then later said that he got it from his uncle.

100.    Smego also admitted that that the copper wire Walsh had was not unique nor was it an unusual amount because he (Smego) had gathered more previously.

101.    After the State finished presenting their case, Walsh moved for a directed verdict.

102.    Judge Burmila granted the motion, reasoning:

> [W]hat we have here is that Kaluzny Brothers purchased a 500 foot roll of wire, that the wire was in a certain form, that they used approximately 270 feet of the wire, and that the balance of the wire was on a spool kept in the boiler room. The boiler room was accessible, apparently to anybody that worked in the plant. The plant was active 24 hours a day with the exception of late Saturday afternoon until early Monday morning. And during that period of time they had a security force in the building to make sure that the property was secure and that the building was secure. So there apparently never was an occasion that the building was unoccupied.
>
> A supposition was made by management that the copper wire which could not then be located was in fact stolen. ***Now, no one saw the defendant with the wire. No one saw anybody remove the wire from the premises.*** It was simply there one day and not there the next. The only situation that the copper wire was moved was testimony that there was dirt on the floor and the spool of wire might have been rolled over the dirt. But it strikes the Court that whether the movement was lawful or unlawful, we would have markings in the dirt.
> . . . .
>
> The wire could not be located after January the 3rd of 2013. And that sometime after that ***the defendant and a friend of his sold wire that was not in black casing, was not distinguishable in any specific fashion***, at Lemont Scrap Yard. . . .
>
> Now, it's not for lack of effort on the State's part, and it isn't even a question of lack of proof beyond a reasonable doubt, because the corpus delicti does not have to be proven beyond a reasonable doubt. There only has to be some evidence to indicate that a crime occurred. Then we would apply the defendant's statement and see what the circumstances would be thereafter. This, in the Court's opinion, ***is one of <u>those rare instances</u> that the Court simply is not able to meet the corpus delicti and demonstrate that in fact a crime occurred***, even before we apply any statements that

-17-

Mr. Walsh made either to Mr. Smego or Mr. Smith. . . .

I can only take into account what's demonstrable. And on these facts the State's unable to demonstrate the corpus delicti and the defendant is acquitted of both of these charges.

(Emphasis added).

103.    Nine months after being falsely arrested, Walsh's nightmare was finally over.

## COUNT I

**42 U.S.C. § 1983—False Arrest/Unlawful Detention on January 31, 2013**
**(Against Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers)**

104.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

105.    At all relevant times, Walsh enjoyed and possessed a right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable seizures.

106.    Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers did not have probable cause to arrest Walsh for theft.

107.    Despite lacking probable cause to arrest Walsh for theft, Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers falsely arrested Walsh, or caused Walsh to be falsely arrested, and unlawfully detained without probable cause on January 31, 2013.

108.    Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers were acting under color of law at all relevant times.

109.    Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers' conduct was with malice, intentional, in bad faith, or in the alternative, reckless, and was not the result of mistake or negligence, and deprived Walsh of his Fourth Amendment right to be free from unreasonable seizures.

110. Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers' acts were a direct and proximate cause of Walsh's deprivation of his Fourth Amendment right to be free from unreasonable seizures.

111. As a direct and proximate result of the Fourth Amendment violations by Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers, Walsh suffered and continues to suffer mental anguish, emotional pain and suffering, loss of income, and legal expenses to defend himself against false charges.

## COUNT II

**42 U.S.C. § 1983—False Arrest/Unlawful Detention on February 1, 2013**
**(Against Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers)**

112. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

113. At all relevant times, Walsh enjoyed and possessed a right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable seizures.

114. Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers did not have probable cause to arrest Walsh for theft.

115. Despite lacking probable cause to arrest Walsh for theft, Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers falsely arrested Walsh, or caused Walsh to be falsely arrested, and unlawfully detained without probable cause on February 1, 2013.

116. Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers were acting under color of law at all relevant times.

117. Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers' conduct was with malice, intentional, in bad faith, or in the alternative, reckless, and

was not the result of mistake or negligence, and deprived Walsh of his Fourth Amendment right to be free from unreasonable seizures.

118.    Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers' acts were a direct and proximate cause of Walsh's deprivation of his Fourth Amendment right to be free from unreasonable seizures.

119.    As a direct and proximate result of the Fourth Amendment violations by Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers, Walsh suffered and continues to suffer mental anguish, emotional pain and suffering, loss of income, and legal expenses to defend himself against false charges.

## <u>COUNT III</u>

**42 U.S.C. § 1983 Claim for Conspiracy to Violate Walsh's Constitutional Rights**
**(Against All Individual Defendants, Including Unknown Rockdale Police Officers and**
**Unknown Kaluzny Bros. Employees)**

120.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

121.    Defendants individually, jointly, and in conspiracy among themselves and with their named and unnamed co-conspirators, are liable to Walsh, pursuant to 42 U.S.C. § 1983, for conspiring to violate Walsh's rights under the Fourth Amendment to be free from unreasonable seizures.

122.    Defendants Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers agreed with George, Defendants Kaluzny, and Unknown Kaluzny Bros. Employees to arrest Walsh without probable cause and unlawfully detain him and deprive him of his rights under the Fourth Amendment to be free from unreasonable seizures.

123.    Defendants engaged in the following overt acts, among others, which were done in furtherance of the conspiracy:

     a.     Kaluzny reported to the Rockdale Police that copper had been stolen from Kaluzny Bros. when there was no evidence that copper had in fact been stolen from Kaluzny Bros.

     b.     Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers intentionally conducted an incomplete investigation to avoid uncovering any evidence that would show that Walsh did not steal copper from Kaluzny Bros.;

     c.     Kaluzny and George made knowingly false statements to Officer Huizenga that the copper wire and a blue barrel in Walsh's car in the photos taken at Lemont Scrap belonged to Kaluzny Bros.;

     d.     Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers deliberately ignored the falsity of Kaluzny and George's statements discussed in subparagraph (c) above.

     e.     Officer Huizenga and Chief Dykstra made deliberate omissions and false statements in their reports to cover up their wrongful conduct.

     f.     Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers arrested or caused Walsh to be falsely arrested without probable cause on January 31 and February 1, 2013.

124.    As a result of these and other overt acts done by Defendants in furtherance of the aims of the conspiracy, Walsh was deprived of his right to be free from unreasonable seizures under the Fourth Amendment, and Walsh suffered and continues to suffer mental anguish, emotional pain and suffering, loss of income, and legal expenses to defend himself against false charges.

## **COUNT IV**

### **Claim for Malicious Prosecution Under Illinois Law**
**(Against Defendants Kaluzny Bros. and Kaluzny, Officer Huizenga, Chief Dykstra, Unknown Rockdale Police Officers, and the Village of Rockdale)**

125.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

126.     Kaluzny and George made knowingly false statements to Officer Huizenga that the copper wire and a blue barrel in Walsh's car in the photos taken at Lemont Scrap belonged to Kaluzny Bros.

127.     The Rockdale Police including Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers relied on the statement(s) from Kaluzny and George to commence a judicial proceeding against Walsh for theft.

128.     Because Kaluzny and George made knowingly false statements and were acting within the scope of their employment at the time they made those statements, the commencement of the judicial proceeding against Walsh is attributable to Kaluzny and Kaluzny Bros.

129.     The Rockdale Police including Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers commenced the judicial proceeding against Walsh for theft even though there was no probable cause.

130.     At all times relevant hereto, Officer Huizenga, Chief Dykstra and Unknown Rockdale Police Officers were acting within the scope of their employment at the Village of Rockdale.

131.     On November 15, 2013, the judicial proceeding against Walsh was terminated in his favor when Judge Burmila granted Walsh's motion for a directed verdict and acquitted him of all criminal charges.

132.     Kaluzny and Kaluzny Bros. acted with malice in getting a judicial proceeding commenced against Walsh because, among other reasons, Kaluzny and George made knowingly false statements to the Rockdale Police.

133.     Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers acted with malice because, among other reasons, they knew that they were relying on false statements from Kaluzny and George and knew that they lacked probable cause to charge Walsh with theft.

134.     Walsh suffered and continues to suffer mental anguish, emotional pain and suffering, loss of income, and legal expenses to defend himself against false charges as a result of Defendants' actions.

## COUNT V

### State Indemnity Claim—745 ILCS 10/9-102
### (Defendant Village of Rockdale)

135.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

136.     Defendant Village of Rockdale is the employer of Defendants Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers.

137.     In Illinois, pursuant to 745 ILCS 10/9-102, public entities such as the Village of Rockdale are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

138.     As a proximate cause of Defendants Officer Huizenga, Chief Dykstra, and Unknown Rockdale Police Officers' unlawful acts, which occurred within the scope of their employment activities, Walsh suffered and continues to suffer mental anguish, emotional pain and suffering, loss of income, and legal expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Derek J. Walsh prays the Court for the following relief:

A.     A trial by jury on all contested issues of fact;

B.  Compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial;

C.  Pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988; and

D.  Such other and further relief as the Court may deem just and proper.

Dated:  April 15, 2015                  Respectfully submitted,

By: /s/ J. Erik Connolly
    J. Erik Connolly
    Christopher J. Letkewicz
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-9703
    Phone: (312) 558-5600
    econnolly@winston.com
    cletkewicz@winston.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2015, I caused a true and correct copy of the foregoing to be served upon counsel of record by electronic filing.


/s/ Christopher J. Letkewicz_____
One of the attorneys for Plaintiff