**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|                                                    |     |                          |
| -------------------------------------------------- | --- | ------------------------ |
|                                                    | )   |                          |
| Derek J. Walsh,                                    | )   |                          |
|                                                    | )   |                          |
| Plaintiff,                                         | )   |                          |
|                                                    | )   | No. 14 C 3412            |
| v.                                                 | )   |                          |
|                                                    | )   |                          |
| Kaluzny Bros. Inc., Peter Kaluzny, Unkown          | )   | Judge Virginia M. Kendall |
| Kaluzny Bros. Inc. Employees, Officer John S.      | )   |                          |
| Huizenga, Police Chief Robert J. Dykstra,          | )   |                          |
| Unkown Rockdale Police Officers, and the           | )   |                          |
| Village of Rockdale                                | )   |                          |
| Defendants.                                        | )   |                          |

## MEMORANDUM OPINION AND ORDER

Derek Walsh sued Rockdale Police Chief Robert J. Dykstra and Rockdale Police Officer John S. Huizenga ("Officer Defendants"), alleging that they conspired with Walsh's former employer[1] to violate his Constitutional Rights (Count III) to have him falsely arrested twice in violation of 42 U.S.C. § 1983 (Counts I & II). Walsh also sued the Officer Defendants and the Village of Rockdale (collectively, the "Rockdale Defendants") for malicious prosecution related to the charges they brought against him stemming from the false arrests (Count IV). The Rockdale Defendants moved for summary judgment claiming that there was probable cause to arrest him and therefore none of the remaining claims can survive. For the reasons stated below, their Motion for Summary Judgment is granted.

---

[1] The suit also named Kaluzny Bros. Inc., Peter Kaluzny, and Unknown Kaluzny Bros. Inc. Employees ("Kaluzny Defendants") as Defendants. On February 21, 2017, the Kaluzny Defendants were dismissed pursuant to a Rule 41(a)(1)(A)(ii) stipulation of dismissal. (*See* Dkt. Nos 121, 122.)

## BACKGROUND

The following facts are undisputed unless expressly noted. During the relevant time, Robert Dykstra was Chief of Police of the Rockdale Police Department and John Huizenga was a Rockdale Police Department Officer. (SOF[2] ¶¶ 3-4.) Rockdale is a municipality located in Will County, Illinois. (*Id.* ¶ 2.)

Sometime prior to January 2013, Derek Walsh was hired by Kaluzny Bros. Inc.[3] ("Kaluzny") as a press operator and worked the second shift five or six days per week. (*Id.* ¶¶ 6-7.) Walsh's shift lasted between eight and twelve hours. (*Id.* ¶ 7.) On January 2, 2013, Peter Kaluzny, a Kaluzny employee, was informed by Steve Fenglio, another Kaluzny employee, that a spool of copper wire was missing from the Kaluzny boiler room. (SOAF ¶ 2.) The boiler room was generally unlocked and anyone who worked at Kaluzny, including Walsh, had access to the room. (SOF ¶ 9.) The wire on the spool was approximately three inches wide, flat, covered in black insulation and at the time it went missing, and weighed several hundred pounds. (*Id.* ¶¶ 6, 9.) Inside the insulation were four wires: three No. 2 gauge wires (red, yellow, and black) and one smaller, No. 6 gauge wire (green). (*Id.* ¶¶ 11, 27; SOAF ¶ 7.) Peter Kaluzny guessed there were approximately 230-250 feet of wire remaining on the spool when it went missing. (Dkt. 118 ¶ 12; Dkt. 116-4 at 69:15-19.) No one saw the spool of wire removed from the boiler room. (SOAF ¶ 4.) On January 7, 2013, shortly after Kaluzny noticed that the wire was missing, Walsh and his friend Tyrone Smego, sold several hundred pounds of copper wire to Lemont Scrap. (SOF ¶¶ 18, 21.)

After being informed of the missing wire, Peter Kaluzny went to the boiler room and confirmed that the wire was missing. (*Id.* ¶¶ 3, 5.) He then informed Thomas George, the

---

[2] References to "SOF" are to the Rockdale Defendants' Rule 56.1 Statement of Facts (Dkt. 116) and references to "SOAF" are to Plaintiff's Rule 56.1 Statement of Additional Facts (Dkt. 120).
[3] Kaluzny is in the business of recycling animal bi-products and cook oils into feed stock.

Kaluzny plant manager, of the missing wire.  (*Id.*)  After George was informed of the missing wire, Andrew Smith, a Kaluzny employee approached George and informed him that he recently had a conversation with Walsh, where Walsh indicated that he had copper to scrap, Lemont Scrap paid the most for copper, and that scrap yards could be sticklers.  (Dkt. 116-6 at 43:23-45:17.)  George instructed Thomas Kaluzny, another Kaluzny employee to go to Lemont Scrap to determine if the missing wire was scrapped there.  (SOF ¶ 9.)  Lemont Scrap permitted Thomas to search through certain bins for wire that had recently been scrapped but he failed to locate the missing wire.  (*Id.* ¶ 10.)

On January 11, 2013, after Thomas failed to find the wire at Lemont Scrap, Kaluzny informed the Rockdale Police Department that the wire was missing.  (SOAF ¶ 11.)  Officer Huizenga responded to the call.  (*Id.* ¶ 11.)  Huizenga first met with Peter Kaluzny and George, and was informed that the boiler room where the wire was last seen was never locked.  (*Id.* ¶ 12.)  According to Huizenga, George told him about Smith's conversation with Walsh, but Huizenga's recounting of George's version varied slightly from Smith's written statement in that it indicated that Walsh told Smith that Lemont Scrap were real sticklers because they asked him for identification when he recently scrapped some items.  (*Id.* ¶ 13.)

After his visit to Kaluzny, Huizenga obtained a copy of the invoice for the wire scrapped at Lemont by Smego and Walsh.  The invoice reflected that Lemont Scrap paid Walsh and Smego $533.30 for two different types of wire: 233 pounds of wire labeled #1 and 88 pounds of wire labeled #2.  (*Id.* ¶ 15.)  Huizenga also obtained photographs from Lemont Scrap showing some of the wire that Walsh and Smego scrapped and Walsh's truck when they scrapped the wire.[4]  (*Id.* ¶ 17.)  The photos show a blue barrel in the bed of Walsh's pickup truck.  (SOF ¶

---

[4] The parties dispute whether one could determine the color of the wires from the photograph and whether the wires in the photograph had any distinguishing features.  (Dkt. 128 ¶¶ 19-20, 25.)

22.)  Huizenga showed the Lemont Scrap photos to Peter Kaluzny and George.  (SOAF ¶ 21.)  Huizenga wrote in his case report that Peter Kaluzny and George positively identified the copper wire as the missing Kaluzny Bros.' wire and also that Peter Kaluzny positively identified a blue barrel in the bed of Walsh's truck outside of Lemont Scrap as property of Kaluzny.  (*Id.* ¶ 22; Dkt. 118-3.)

As part of the investigation, Chief Dykstra also made contact with Smego to discuss the wire he scrapped with Walsh.  (SOF ¶ 28.)  Smego provided Dykstra with a written statement, indicating that he had an account with Lemont Scrap and in early January 2013, Walsh asked him to recycle wire under his account.  (*Id.* ¶ 30; Dkt. 116-13.)  Smego's written statement recounts that Walsh initially told Smego that Walsh found the wire in an alley but Walsh later told Smego that Walsh's uncle gave him the wire as part of a trade. (Dkt. 116-13.)  After they sold the scrap, Walsh gave Smego at least $40 of the proceeds. (Dkt. 118 ¶¶ 35-36.)

On January 30, 2013, Huizenga reached out to Walsh by leaving a voicemail on his girlfriend's phone that "he needed to talk to Derek regarding an incident that had taken place." (SOAF ¶ 29.)  The next day, Walsh went to the Rockdale Police Station where he was met by Huizenga.  (*Id.* ¶ 30.)  At the police station, Walsh was taken to a secure area.  (SOF ¶ 38.)  The parties disagree about what occurred during the interview. Walsh asserts that he was handcuffed to a table for 2-3 hours by Huizenga, including for approximately an hour after he refused to waive his *Miranda* rights.  (SOAF ¶ 30.) Although the Rockdale Defendants dispute that Walsh was handcuffed during the interview, it is undisputed that Walsh refused to sign a *Miranda* waiver form given to him by Huizenga and Dykstra during the interview.  (SOAF ¶ 31.)  After the interview concluded, Walsh left the police station without being charged with any crime. (SOF ¶ 40.)

After Walsh's interview, Huizenga did not investigate further[5] and instead presented a criminal complaint along with the information in his case report to a judge to obtain an arrest warrant. (SOAF ¶33.) The parties have a series of disputes regarding the accuracy of Huizenga's case report. First, the parties dispute whether Huizenga's description of Peter Kaluzny's positive identification of the wires in his report was accurate. (Dkt. 118 ¶ 25; 128 ¶¶ 22-23.) Walsh contends that Peter Kaluzny's characterization cannot be called a positive identification because he told Huizenga only that the wire looked similar to the missing wire and that it could have been from Kaluzny, but without seeing it, he could not say for sure. (SOAF ¶ 23; Dkt. 116-4 at 97:14-21; 115:13-15.) Walsh also disputes the accuracy of Huizenga's report that Peter Kaluzny positively identified the blue barrel in Walsh's truck at Lemont Scrap as belonging to Kaluzny. (*Id.* ¶ 24.) Peter, however, testified that he told the officer the barrel appeared to be from Kaluzny. (Dkt. 116-4 at 115:8-12.) Additionally, Walsh takes issue with the fact that Huizenga did not have Peter Kaluzny or George make a written statement, purportedly in contravention of Rockdale Police Department practices, as described by Dykstra.[6] (SOAF ¶¶ 26-28).

Walsh also submits that Huizenga's case report inaccurately describes his conversation with George. (*See* Dkt. 128 ¶ 14.) Walsh primarily attacks the veracity of Huizenga's recounting of George's conversation with Smith. Huizenga's case report details that George told him that Smith had a conversation with Walsh where Walsh reported that "Lemont Scrap pays

---

[5] Walsh asserts that the investigation stopped with Dykstra's approval and that Dykstra also approved Huizenga's report without revisions, even though he had reviewed the photographs.

[6] The Rockdale Defendants argue that the information is irrelevant, citing *Thompson v. City of Chicago*. 472 F.3d 444 (7th Cir. 2006). In *Thompson*, a Section 1983 suit involving allegations of excessive force, the Seventh Circuit affirmed the exclusion of evidence regarding the Chicago Police Department's General Orders Regarding Use of Force because conformity with police practice was irrelevant to determining whether the police officer's actions were objectively reasonable under the Fourth Amendment. Here, the situation is different. Whether Huizenga conformed with police practices regarding written reports could bear on whether he falsified his report, not whether he conformed with the Village's arrest policies.

good money for copper" but that "they were real sticklers because they asked him for identification when he recently scrapped some items." (SOAF ¶ 13; Dkt. 118-3.) This statement is slightly different from Smith's written statement where Smith reported that Walsh told him scrap yards are sticklers about taking in scrap. (*Id.*) According to his statement, Smith then asked if Walsh had tried All American Scrap and Walsh responded that that he had copper and Lemont Scrap paid the most for copper. (*Id.*; Dkt. 118 ¶ 13; SOF ¶ 16; Dkt. 116-6 at 50-55.) Smith, however, testified that his understanding of what Walsh meant by using the word "sticklers" was that scrap yards required identification before taking scrap. (Dkt. 116-6 at 52:2-10.) George is deceased and cannot clarify the point, and Huizenga was not deposed. Walsh also takes issue with Huizenga's report because it notes that George went to look for the missing wire at Lemont Scrap. Walsh contends that George never went to Lemont Scrap, rather Thomas Kaluzny went to the scrap yard. Notably, Walsh does not present any direct evidence that contradicts George's positive identification of the wire to Huizenga or that undermines George's other statements to Huizenga.

When seeking the warrant, Huizenga gave the judge his case report, which included his recounting of Peter Kaluzny and George's statements. (SOAF ¶¶ 35-36). Huizenga did not give the judge the photos he obtained from Lemont. (*Id.*) Pursuant to an arrest warrant issued by the judge, Huizenga arrested Walsh on February 1, 2013, who was charged with two counts of theft, charges which were approved by the State's Attorney's Office. (*Id.* ¶ 37; SOF ¶ 44.) Specifically, Walsh was charged with theft in violation of 720 ILCS 5/16-1 which requires that a person knowingly obtain or exert unauthorized control over property of the owner and intends to deprive the owner permanently of the use or benefit of the property. 720 Ill. Comp. Stat. Ann.

5/16-1. Following his arrest, Walsh was detained for nine days before posting bond. (SOF ¶ 43.)

At trial, the judge entered a directed verdict in favor of Walsh finding that the State failed to prove its case beyond a reasonable doubt. (SOAF ¶ 38.) In granting the directed verdict, the judge noted that it "is one of those rare instances that the Court simply is not able to meet the corpus delicti and demonstrate that in fact a crime occurred." (*Id.* ¶ 39.) In coming to its decision, the court focused on the fact that the boiler room where the wire was stored was accessible by anybody who worked at Kaluzny. (*Id.*) The court also noted that no one saw Walsh with the wire, and the wire he sold to Lemont Scrap was not distinguishable in any specific fashion. (*Id.*)

## **LEGAL STANDARD**

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 681–82 (citing *Anderson,* 477 U.S. at 248). On the other hand, "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the nonmoving party, there is nothing for a jury to do." *Bunn,* 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis in original)). In determining whether a genuine issue of material fact exists, the Court construes the evidence and all inferences that reasonably can be

drawn in the light most favorable to the nonmoving party.  *See id.* at 682 (citing *Anderson,* 477

U.S. at 255); *see also Kvapil v. Chippewa County, Wis.,* 752 F.3d 708, 712 (7th Cir. 2014).

<u>**DISCUSSION**</u>

The Rockdale Defendants' central argument is that probable cause existed to justify

Walsh's arrests[7] defeating his Section 1983 and malicious prosecution claims.  (Dkt. 115 at 6-8,

12.)  Relatedly, they argue that the false arrest claims cannot survive because Walsh was arrested

pursuant to a "valid" arrest warrant on February 1, 2013.  (*Id.* at 9-10.)  The Officer Defendants

also argue that Walsh's conspiracy claim fails because the officers never had a meeting of the

minds with Kaluzny employees and further that there was no constitutional violation. Because

they arrested Walsh on probable cause and there was no constitutional violation, the Officer

Defendants also claim that they are entitled to qualified immunity.  (Dkt. 115 at 14.)

Plaintiff's central argument is that the Court cannot rule as a matter of law that probable

cause existed, even with the existence of the judge-issued arrest warrant, because the facts that

the Defendant Officers presented to the judge were inconsistent with their investigation,

revealing that they were conspiring to violate his constitutional rights.  Plaintiff points to these

inconsistencies to set forth his conspiracy theory and to argue that the judge-issued arrest warrant

was not valid based on these inconsistencies; essentially, that if the judge knew of these

inconsistencies, he would never have issued the warrant.

**I.  False Arrest Claims**

The Officer Defendants argue that probable cause existed to arrest Walsh, barring his

false arrest claims.  (Dkt. 115 at 6.)  *See Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir.

2017) ("Probable cause acts as an absolute bar to a claim for false arrest.").  "Probable cause to

---

[7] They also argue that Plaintiff was not arrested on January 31, 2013, but rather voluntarily attended a police interview.  Based on Walsh's testimony that he was handcuffed to a table while being interviewed, there is at least an issue of material fact as to whether his January 31 encounter with Huizenga constituted an arrest.

arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). "Probable cause requires only that a probability or a substantial chance of criminal activity exist." *Purvis v. Oest*, 614 F.3d 713, 722–23 (7th Cir. 2010). "[A] plaintiff claiming that he was arrested without probable cause carries the burden of establishing the absence of probable cause." *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009). In deciding whether probable cause existed "as part of a motion for summary judgment, however, we must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013).

Viewing the evidence in the light most favorable to Walsh, there are two arrests to evaluate for probable cause: Walsh's January 31, 2013 interview, where he asserts he was handcuffed to a table in the police station; and his February 1, 2013 arrest, which was made pursuant to a warrant. No further police investigation occurred after the January 31, 2013 arrest, and therefore the information available to Huizenga and Dykstra was the same for both incidents.

A.     **January 31, 2013 Arrest**

For purposes of evaluating the Defendants' Motion for Summary Judgment, the Court must accept the Plaintiff's version of the interview, where he asserts he was handcuffed to an interview table for several hours. Assuming that the January 31 interview constituted an arrest, the analysis focuses on whether probable cause existed to justify the arrest. "Probable cause ...'is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances.'" *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir. 2013) (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir.2012)). "We objectively 'step into the shoes of

a reasonable person in the position of the officer,' and consider the facts known to the officer at the time." *Id.* (internal quotation marks and citation omitted).

Walsh first argues that there was no evidence of a theft of wire from Kaluzny, let alone, that he was involved in the theft. Walsh claims that because there were no eyewitnesses to the purported theft, all Kaluzny employees had access to the boiler room where the wire was stored, and that the wire could have been misplaced or used, the Officers did not have probable cause to arrest him. In support, he cites *Stevens v. Dewittt Cnty., Ill.*, 2012 WL 1066890, at *5 (C.D. Ill. Mar. 28, 2012) for the non-controversial proposition that there is no probable cause when there is no evidence of a crime. That case, which involved evaluating a complaint on a motion to dismiss, is inapplicable here. Walsh's argument appears to borrow from the judge's decision in the criminal matter granting Walsh's motion for a directed verdict, where he found that there was insufficient evidence of a crime to support a conviction. Walsh throws aside the significant difference between the standard of proof to establish probable cause to arrest and whether there was proof to convict him of the theft beyond a reasonable doubt. The criminal trial judge had the benefit of all of the evidence presented to him and reached the conclusion that the evidence could not support of finding beyond a reasonable doubt that Walsh had committed any crime. Emboldened by the judge's decision, Walsh would have this Court apply the criminal judge's burden of proof to the issue of probable cause to arrest which is simply not appropriate. *See Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003) (noting that "[a]ll acquittals and terminated prosecutions do not lead to liability under § 1983" when disregarding argument attacking probable cause based on "fact that all of the charges against [the plaintiff] were eventually dropped"). The proper analysis is to view whether there was probable cause to arrest at the time. Applying the judge's acquittal ruling after hearing *all* of the evidence at trial

to the analysis of whether the Officer properly arrested him improperly relies on hindsight in assessing probable cause. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010) (citing *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) ("A court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect."). As discussed below, at the time of the arrest, there was significant circumstantial evidence of a theft and evidence indicating that Walsh was involved in the theft. Probable cause need not be based on eyewitness testimony or even direct evidence. In fact, the law makes no distinction between direct evidence and circumstantial evidence, and as such, it is not unusual that crimes are proved beyond a reasonable doubt on circumstantial evidence alone. *United States v. Thomas*, 763 F.3d 689, 693 (7th Cir. 2014); *see United States v. Sewell*, 413 F. App'x 890, 892 (7th Cir. 2011) (finding that affidavit based on circumstantial evidence supported probable cause).

Walsh next argues that the Rockdale Defendants lacked reasonably trustworthy information that Walsh committed a theft, again relying in several places on Judge Burmila's determinations in the criminal matter that the evidence presented at trial did not support a conviction for theft beyond a reasonable doubt. (*See* Dkt. 119 at 9.) Examining the evidence available to Huizenga and Dykstra at the time of the arrests, however, shows that they had probable cause to arrest Walsh. As of January 31, 2013, Huizenga knew that Walsh had access to the missing wire, had discussed scrapping wire with a colleague, and had complained that scrap yards were sticklers. Shortly after the wire was determined to be missing, Walsh had Smego use his account at Lemont Scrap to sell an amount of copper wire that was similar to the

amount of wire that went missing.[8]  Considering Walsh's comment regarding scrap yards being "sticklers" combined with his use of Smego's account to sell the wire, Huizenga could have reasonably inferred that Walsh purposely avoided the scrutiny of the scrap yard because the wire was stolen.  Additionally, Walsh told Smego different stories about where the wire came from, which buttresses Huizenga's reasonable inference that Walsh was lying about the source of the wire because it was stolen.[9]  Most importantly, Huizenga's report indicates that Peter Kaluzny *and* George positively identified the wire from Lemont Scrap photos as belonging to Kaluzny.  Although Walsh disputes whether Peter actually positively identified the wire as belonging to Kaluzny, nothing in the record negates that identification nor is there information to suggest that George's identification was not trustworthy.  The Seventh Circuit has consistently held that "[a] police officer is permitted to rely on information provided by an eyewitness as long as the officer reasonably believes the witness is telling the truth."  *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015), *reh'g denied* (Oct. 16, 2015) (affirming summary judgment for defendant officers because no reasonable jury could find that the police lacked probable cause for arrest because officers had no reason to doubt witness identification of plaintiff); *see also Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause.").  Here, nothing in the record would have made it unreasonable for the Officer Defendants to rely on George's identification of

---

[8] Walsh posits that Walsh and Smego's invoice from Lemont Scrap is exculpatory because it indicates that the wire they sold was different from the missing Kaluzny wire.  There is no evidence in the record, however, to support this inference and "we are not required to draw inferences that, 'are supported by only speculation and conjecture.'" *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013); *see* also Forrest v. Prine, 620 F.3d 739, 746 (7th Cir. 2010) (affirming summary judgment for defendant officer in Section 1983 suit where speculative theory did not support inference proposed by plaintiff).  The missing wire comprised three strands of No. 1 gauge copper wire and one strand of No. 6 gauge wire.  The invoice lists two different types of wire (#1 and #2) but there is no evidence that the labeling of the wire indicates its gauge, rather than just indicating that there were two different wires.

[9] Smego's statement could also have led Huizenga to reasonably believed that Walsh stole the copper wire from somewhere other than Kaluzny.  "[P]robable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause…."*Gill*, 850 F.3d at 342 (quotation omitted).

the wire as belonging to Kaluzny. George was the Kaluzny plant manager, was familiar with the missing wire, and there has been no evidence presented that would indicate that he had any reason to falsely implicate Walsh. Further, there is no evidence that Huizinga or any other officer pushed George to positively identify the wire or that Huizenga should have been suspicious of George's identification. In fact, the photographs of the wire scrapped by Walsh, which appear to be black, green, red and yellow, the same colors that comprised the missing wire, supports the officer's acceptance of George's statement to him and the identification of the wire by George. Even if Peter Kaluzny's statements were totally disregarded, focusing solely on the undisputed information available to the officers at the time of the arrest, including George's positive identification of the wire, which has not been challenged, and the substantial circumstantial evidence pointing to Walsh's involvement, there was sufficient evidence available to the Officer Defendants at the time of the arrest to supply probable cause to justify Walsh's arrest. *See Tapley v. Chambers*, 840 F.3d 370, 377 (7th Cir. 2016) (noting that the probable cause "determination 'involves examining the totality of the circumstances in a common sense manner.'") (quoting *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003)); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 969 (7th Cir. 2003).

Finally, the fact that Walsh was purportedly handcuffed during his interview has no bearing on the probable cause analysis. During his interview on that day, Walsh alleged he was handcuffed to a table. The Court will assume that he was arrested and detained. Walsh uses this statement to support his contention that the Defendant Officers lacked probable cause to arrest him. Once again, Walsh is mixing standards and comparing apples to oranges. Walsh adds this allegation to bolster his position that the Defendant Officers did not have probable cause to arrest him and therefore their true intent was to violate his rights. Yet, nothing that came out of the

interview on January 31 was used as a basis to obtain the arrest warrant. Walsh's accusation that he was handcuffed to the table for hours is directly refuted by Defendant Officers and as such would be a fact dispute necessitating a trial if the allegations in the complaint included excessive force or false imprisonment.[10] Yet, Walsh has never presented those claims in spite of the case having been filed over two and a half years ago. Plaintiff has never sought leave of court to amend his pleadings to comport to the evidence gathered during discovery. Therefore, since the Defendant Officers obtained no new evidence from that interview to support the arrest warrant affidavit, the fact that he was detained for three hours is immaterial to whether probable cause existed because this Court has already held that probable cause existed at the time of either arrest as there was no further investigation between Walsh's interview and arrest the next day. If there was probable cause to arrest on the exact same information on February 1 and on January 31, the Defendant Officers cannot be held to have falsely arrested him. As for the aggressiveness of the detention, even if this Court were to take the allegation as true, which the Court will do for this analysis, that aggressiveness was not charged in Walsh's 2014 complaint and has never been presented to the Court. *See Lenard v. Argento*, 808 F.2d 1242, 1246 (7th Cir.1987) ("False arrest and excessive force are unrelated except in forming a sequence. Arresting a person on probable cause does not justify beating him up, and the beating does not invalidate the arrest. These forms of misconduct thus are independent conceptually as well as in time.").

**B.  February 1, 2013 Arrest**

Although the evidence available to Huizenga was the same on January 31 as it was on February 1, the second arrest was made pursuant to a warrant, which impacts the analysis for that arrest. Walsh's claim must be rejected because he has failed to identify evidence indicating that

---

[10] The existence of probable cause is also an absolute defense to a claim for false imprisonment. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).

the arrest warrant was "based on fabricated evidence or otherwise lacked probable cause." *See, e.g., Kelly v. Hocking*, No. 11 C 50024, 2014 WL 12550551, at *4 (N.D. Ill. Feb. 20, 2014). In order to state a claim for false arrest when the arrest is made pursuant to a warrant, the plaintiff must show that the warrant was facially invalid or that the officers who made the arrest knew that the warrant was issued without probable cause. *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013). Here, the arrest warrant was not facially invalid, so Walsh must argue that Huizenga knew that there was not probable cause and that he deceived the judge who issued the warrant. *See Juriss v. McGowan*, 957 F.2d 345, 350-51 (7th Cir. 1992). Although we presume the validity of warrants and the information offered to support them, this presumption may be overcome if Walsh can demonstrate that Huizenga "knowingly, intentionally, or with reckless disregard for the truth" made "false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003). "The presumption may also be overcome by evidence showing that the officer intentionally or recklessly withheld material facts from the warrant-issuing judge." *Whitlock v. Brown*, 596 F.3d 406, 410–11 (7th Cir. 2010). "Immaterial misstatements will not invalidate an otherwise legitimate warrant," *Forman v. Richmond Police Dep't*, 104 F.3d 950, 964 (7th Cir.1997), neither will immaterial omissions. *Molina*, 325 F.3d at 968.

Walsh first argues that Huizenga put false statements in his case report, which was submitted to the judge who issued the arrest warrant, when Huizenga reported that Peter Kaluzny "positively identified" the wire in the photograph from Lemont Scrap. Walsh also submits that Huizenga improperly omitted exculpatory information when he failed to show the photographs of Lemont Scrap to the judge and that he also relied on untrustworthy information. Although

Plaintiff attempts to raise an issue of fact by alleging that these inconsistencies and alleged omissions demonstrate that Huizenga was hiding evidence or was lying to the judge to get him arrested, the inconsistencies he presents do not rise to the level of being material or obvious to the point that a reasonable juror could suspect that Huizenga intentionally or even recklessly provided false material information or omissions to obtain the arrest warrant. The purported misrepresentations and omissions are neither false nor material. *See United States v. Hester*, 552 Fed.Appx. 580, 583 (7th Cir. 2014) (agreeing that "conclusory allegations about the falsification of the search-warrant affidavit" are insufficient). Even if the Court determined that there is an issue of fact as to whether some of these alleged inconsistencies were material misrepresentations or omissions, Plaintiff has failed to submit any facts to support the conclusion that Huizenga intentionally or recklessly submitted them to the issuing judge.

Walsh first attacks Huizenga's description of Peter Kaluzny's positive identification of the wire that Walsh scrapped. In his deposition, Peter Kaluzny testified that he told Huizinga that the wire from the photographs that Walsh scrapped "looked similar" to Kaluzny's wire but without actually seeing the wire, he could not be sure it was the missing Kaluzny wire. (Dkt. 116-4 at 97:14-21.) Although Peter's testimony is not inconsistent with a positive identification, Peter Kaluzny's qualifying language could have been included in Huizenga's report. This potential omission, however, is not material. Although intentionally or recklessly omitting important exculpatory information from the material provided to obtain a warrant can undermine the legitimacy of the warrant, "[t]he materiality of an omitted or misrepresented fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause." *Whitlock*, 596 F.3d 406 at 411. Here, the inclusion of Peter Kaluzny's qualifying language would not have negated probable cause.

Huizenga's case report indicates that Peter Kaluzny *and* George positively identified the wire in the photos as the missing Kaluzny wire. (Dkt. 118-3.) Walsh, however, only takes issue with the characterization of Peter's positive identification of the wire and says nothing about Huizenga's recounting that George also positively identified the wire. That is likely because there is no evidence to undermine the veracity of George's positive identification of the wire. As noted above, the Seventh Circuit has "consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause." *Woods*, 234 F.3d at 996. As a result, the fact that Huizenga did not include Peter Kaluzny's qualifying language would not have negated probable cause because George's positive identification of the wire on its own (putting aside the other circumstantial evidence implicating Walsh) supports a finding of probable cause. *See Hart*, 798 F.3d at 593 (finding that officer's failure to include a qualification from a witness who was "pretty sure" that the plaintiff committed a crime was immaterial because other witnesses identified the plaintiff without qualification).

Walsh similarly takes issue with Huizenga's report indicating that Peter Kaluzny positively identified a blue barrel used to transport the wire Walsh sold at Lemont Scrap. Peter Kaluzny's testimony regarding what he told Huizenga about the blue barrel in Walsh's truck, however, is consistent with a positive identification. Peter Kaluzny testified that he told Huizenga that the blue barrel looked like it came from Kaluzny and appeared to be a Kaluzny barrel. (Dkt. 116-4 at 116:2-9). As a result, there is nothing potentially false about Huizenga's characterization. Even if the Court were to find that Huizenga should have used qualifying language in his description of Peter's identification of the blue barrel or more precisely described his identification, for the same reasons as discussed above, that omission is immaterial because it would not negate probable cause due to George's uncontested identification connecting the

missing wire to Walsh and a significant amount of other circumstantial evidence. *See Molina*, 325 F.3d at 970 (affirming determination of probable cause even though there may have been reasons for the Officer to doubt the veracity of a witness's allegations, if those allegations were disregarded, other information available to officer at time were sufficient to support probable cause). Walsh also attacks the reliability of Peter Kaluzny's identification of the blue barrel, arguing that it had no distinguishing characteristics. Walsh forgets, however, that Huizenga can rely on the identifications of credible victim statements and that "[t]he police need not exhaust all available avenues of investigation, including those that might potentially exculpate the suspect." *Seiser v. City of Chicago*, 762 F.3d 647, 654 (7th Cir. 2014). At the time of the arrests, Huizenga had no reason to suspect Peter Kaluzny's identification of the barrel was anything but truthful.

Walsh also attacks Huizenga's failure to provide the photographs from Lemont Scrap to the judge issuing the warrant. "One way of approaching the materiality question is to ask 'whether a hypothetical affidavit that included the omitted material would still establish probable cause.'" *Whitlock*, 596 F.3d at 411 (7th Cir. 2010) (quoting *United States v. Robinson*, 546 F.3d 884, 888 (7th Cir.2008)). A hypothetical affidavit that included the Lemont Scrap photographs would demonstrate the omission of the photographs to be immaterial as the affidavit would still establish probable cause. It would still include George's identification of the wire, along with Smego's statement of Walsh's inconsistent statements regarding the origin of the wire, a description of Smith's conversation with Walsh regarding scrap yards being sticklers and other circumstantial evidence already discussed. Moreover, a hypothetical affidavit including the photographs would be stronger than the one presented to the judge who issued the warrant, as the wire that Walsh scrapped at Lemont Scrap appear from the photographs to be the same colors of

those that comprised the missing Kaluzny wire, corroborating George and Peter Kaluzny's testimony.[11]

Lastly, Walsh attacks several purported inconsistencies in Huizenga's report regarding George's statements to Huizenga. Walsh first takes issue with the description of the conversation between Smith and Smego, as relayed by George to Huizenga. Huizenga's report indicates that George reported that Smith informed him of a conversation he had with Walsh where Walsh said that "Lemont Scrap pays good money for copper" and that "they were real sticklers because they asked him for identification when he recently scrapped some items." (Dkt. 118-3.) The purported inconsistency is that Smith testified that Walsh told him that Lemont paid good money for scrap and that scrap yards were sticklers. Walsh also contends that Huizenga's report is false because it notes that George told Huizenga that he went to Lemont Scrap to look for the missing wire before calling the Rockdale Police, whereas Thomas Kaluzny testified that he went to Lemont Scrap to look for the missing wire. These purported inconsistencies however do not undermine probable cause because they are not inconsistent with the record and "even if they are not reconcilable, the inconsistencies are of 'minimal significance.'" *Molina*, 325 F.3d at 970.

First, it is important to remember that Walsh challenges George's description of what Smith told him about a conversation between Smith and Walsh. Plaintiff fails, however, to present any evidence that Huizenga misrepresented George's statement about his conversation with Smith in his report. In fact, Plaintiff did not depose either George or Huizenga; and Peter Kaluzny did not recall the specifics of what George told Huizenga. There is simply no evidence to demonstrate that George's account of Smith's conversation as reflected in Huizenga's report

---

[11] The Court also notes that Huizenga's report included actual exculpatory information, including the fact that the boiler room was left unlocked.

was false, let alone that Huizenga acted intentionally or recklessly by including them. In any case, the minor discrepancies between Smith's written statement and Huizenga's recounting of his conversation with George about George's conversation with Smith are immaterial, especially when considering that Smith's own testimony is consonant with Huizenga's report. (*See* Dkt. 116-6 at 52:2-10) (Smith testifies that he understood Walsh's reference to scrap yards being sticklers "as requiring an I.D. or fingerprint"). No reasonable jury could conclude that such a minor inconsistency, that is not contradicted by evidence in the record, would undermine probable cause. There is no evidence that it is false, or material, let alone that Huizenga acted recklessly or intentionally when he included it in the report. *See Hart*, 798 F.3d at 591 (7th Cir. 2015), *reh'g denied* (Oct. 16, 2015) ("[M]inor inconsistencies among witnesses' statements [do not] necessarily imply that they are mistaken or dishonest.").

Similarly, there is no evidence to contradict George's assertion to Huizenga that George went to Lemont Scrap to look for the missing wire. Although it is clear from the record that Thomas Kaluzny went to Lemont Scrap, it is not inconsistent with the record that George also went looking for the missing wire. Furthermore, even if Thomas Kaluzny went to look for the missing wire and George did not, the difference is immaterial, as that portion of Huizenga's report does nothing more than indicate that a Kaluzny employee went to the scrap yard to look for the missing wire and then called the Rockdale Police Department. Those facts merely provide context to Huizenga's report and do not inculpate Walsh, thus their exclusion would do nothing to negate probable cause.

Lastly, even if Huizenga's report included material omissions or misrepresentations, Walsh has failed to identify evidence in the record that the Officers knowingly or recklessly made those statements or omissions. *Molina*, 325 F.3d 963 at 968. There is no evidence

whatsoever to support the supposition that Huizenga acted intentionally when omitting any of the purportedly exculpatory information or including any of the purportedly false statements. Neither is there an issue as to whether Walsh acted recklessly. "A 'reckless disregard for the truth' is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). None of those factors apply here. As discussed above, none of the alleged omissions negate probable cause due to George's uncontested witness identification of the wire in the report and circumstantial evidence pointing to Walsh's involvement. Additionally, there is no evidence that the Officer Defendants entertained serious doubts as to the truth of their statements, especially as many of them, including the statements of Smego and Smith were confirmed by corroborating statements in the record. Similarly, there is no evidence to support the conclusion that the officers had obvious reasons to doubt the accuracy of the information reported. As discussed at length, the witness statements, including George's positive identification of the wire, were consistent with photographs taken of the wire that Walsh scrapped shortly after Kaluzny's wire went missing. Based on these facts, there is insufficient evidence to support the supposition that Huizenga knowingly or recklessly submitted a false report and omitted exculpatory facts to cause Walsh's arrest.

## II.     Malicious Prosecution

"'To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding [by the defendant]; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable

cause; (4) malice; and (5) damages.'" *Colbert v. City of Chicago*, 851 F.3d 649, 654–55 (7th Cir. 2017) (quoting *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016). "The failure to establish any one element bars recovery." *Cairel*, 821 F.3d at 834. "On summary judgment, defendants can prevail on such a claim if they demonstrate that no reasonable jury could find an absence of probable cause to initiate the charges." *Id.* "In a malicious prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.'" *Williams*, 733 F.3d at 759 (quoting *Gauger v. Hendle*, 352 Ill.Dec. 447, 954 N.E.2d 307, 329–30 (Ill. App. 2011) (emphasis omitted).

The Rockdale Defendants argue that the existence of probable cause similarly precludes Walsh's malicious prosecution claim, brought under state law. For the same reasons that establish probable cause under the Fourth Amendment, the undisputed material facts establish that a person of ordinary care would believe or entertain an honest and sound suspicion that Walsh stole the copper wire. At the time of the arrests, Huizenga was aware of George's uncontested identification of the wire Walsh sold as being the missing wire from Kaluzny, he had the statements of Smego and Smith, in addition to other circumstantial evidence of Walsh's involvement, including the fact that Walsh sold several hundred pounds of copper wire in close proximity to when the wire went missing from Kaluzny. As a result, Walsh's claim for malicious prosecution fails as a matter of law.

## III. Qualified Immunity

The Rockdale Defendants also argue that they are entitled to qualified immunity. Qualified immunity protects public officials, including police officers, from liability when their actions "did not violate clearly established rights of which a reasonable person would have

known." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009) (citations omitted). "The qualified immunity standard gives ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "To overcome qualified immunity, a plaintiff must show that (1) the facts make out a violation of the plaintiff's federal rights, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct." *Catlin*, 574 F.3d at 365.

As a threshold matter, there is no question that at the time of Walsh's arrests, the "constitutional right to be free from arrest without probable cause was clearly established." *Fleming v. Livingston Cty., Ill.*, 674 F.3d 874, 879 (7th Cir. 2012). The only question then is whether Huizenga and Dykstra violated Walsh's federal rights. As discussed above, because there was probable cause for the arrests, Walsh's rights were not violated. Even if a dispute of material fact existed as to whether there was probable cause to arrest Walsh, his Section 1983 claims would fail because Officer Huizenga and Chief Dykstra are entitled to qualified immunity because there was at least "arguable" probable cause to support the arrests and Walsh has failed to meet his burden to overcome qualified immunity.

"When, as here, the defendants have raised a qualified immunity defense to a false-arrest claim, 'we will review to determine . . . whether a reasonable officer could have mistakenly believed that probable cause existed.'" *Fleming*, 674 F.3d at 878 (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998. Courts refer to this inquiry as "asking whether the officer had 'arguable' probable cause." *Humphrey*, 148 F.3d at 725. Although the analysis of whether "arguable" probable cause is closely related to the determination of whether probable cause existed, it is a "separate and distinct" analysis. *Burritt v. Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015) "Arguable probable cause exists when 'a reasonable police officer in the same

circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.'" *Humphrey*, 148 F.3d at 725 (citing *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997)).   "Officers are entitled to summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken."  *Id.*  For the reasons discussed at length, even if there is an issue regarding the existence of probable cause, Officer Defendants could have reasonably believed probable cause existed, based on the information they were provided by Peter Kaluzny, George, Smego, and Smith.

Furthermore, Walsh has failed to satisfy his burden to overcome the invocation of qualified immunity.   "Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24.   Walsh has done neither.   Instead, he rehashes his failed arguments regarding Huizenga's purported misrepresentations of Peter Kaluzny and George's statements and his omitting the photographs from the material supporting the warrant affidavit.  As already discussed, these facts do not undermine a finding of probable cause, let alone demonstrate that no reasonable officer could have thought he was acting lawfully.

Instead of submitting closely analogous cases where qualified immunity did not apply, he relies on two distinguishable cases.  The first, *Collier v. City of Chicago*, involved disputed facts that could have led a reasonable jury to conclude that the police fabricated a wide range of evidence to tie a defendant to a large quantity of drugs. *Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408, at *5 (N.D. Ill. Aug. 26, 2015).   In *Collier*, the evidence at issue

solely involved he-said-she-said allegations of evidence tampering and fabrication between police and the plaintiff, none of which could be corroborated, depriving the officers of qualified immunity. Here, much of the information available to Huizenga and included in his report was provided to him by credible third parties (Smith, Smego, Peter Kaluzny, and the photographs) or was uncontested (George's identification of the wire). In the other case relied upon by Walsh, *Betker v. Gomez*, much of the information in the probable cause affidavit was contradicted by sworn testimony. 692 F.3d at 860.[12] As explored more fully in previous sections, the information in Huizenga's report is almost entirely consistent with deposition testimony or uncontested. Peter Kaluzny's testimony regarding his statements to Huizenga regarding the identification of the wire was not inconsistent with a positive identification but nonetheless, even if disregarded or if qualifying language were included, there was sufficient probable cause to support the warrant, a fact absent from *Betker*.

Lastly, before obtaining the arrest warrant for Walsh, Huizinga consulted with a Will County State's Attorney. (Dkt. 118-3.) Such consultation "may not give an officer absolute immunity from being sued for false arrest, but it goes far to establish qualified immunity.

---

[12] In *Betker*, the court also performed a qualified immunity analysis, similar in scope to the probable cause analysis performed above. If the Court were to apply that test here to validity of the arrest warrant, qualified immunity would still be appropriate. "An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause." *Betker*, 692 F.3d at 860 (7th Cir. 2012). The evidence submitted establishes that the Officers had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause. As discussed at length above, all of the alleged inaccuracies in his report, are non-existent, immaterial, or could be explained by innocent mistake. The photos that were referenced in Huizenga's report but that were not provided to the Judge do not undermine probable case. There is no evidence in the record that could lead a reasonable jury to conclude that Huizenga's statements regarding his conversation with George, were inaccurate, let alone falsified. Huizenga's failure to have Peter Kaluzny and George submit written statements does not evidence an effort to fabricate probable cause, especially because Peter's statements in Huizenga's reports are largely corroborated by his testimony and there is no evidence to discredit Huizenga's reporting of George's statements. Furthermore, "such criticism of police methods does not by itself establish a constitutional violation." *Hart*, 798 F.3d 578 at 588. Lastly, and as noted earlier, even if the material submitted to the judge who issued the arrest warrant were stripped of any alleged inconsistencies and any purported omitted exculpatory information was included, there was still sufficient inculpatory information to support a finding of probable cause.

*Fleming*, 674 F.3d 874 at 881. For the foregoing reasons, even if there were an issue precluding summary judgment on the issue of probable cause, Huizenga and Dykstra are entitled to qualified immunity as to the Section 1983 claims.

## IV. Conspiracy

"To sustain a cause of action for conspiracy under § 1983, plaintiffs must show that a conspiracy existed and that it deprived them of rights protected by federal law." *Vasquez v. Hernandez*, 60 F.3d 325, 330 (7th Cir. 1995). Due to the existence of probable cause, Walsh's conspiracy claims fails because he cannot establish a constitutional violation. Walsh has also failed to present any facts that could lead a reasonable jury to determine that a conspiracy between the Kaluzny Defendants and Officer Defendants existed and his response brief fails to address the Officer Defendants' arguments regarding the lack of a conspiracy, apparently conceding the argument. *See, e.g.*, *Swedish Am. Hosp. v. Midwest Operating Engineers Fringe Ben. Funds*, 842 F. Supp. 1039, 1043 (N.D. Ill. 1993). For these reasons, the Officer Defendants are granted summary judgment as to the conspiracy count.

## CONCLUSION

For the reasons explained therein, the Court grants the Rockdale Defendants' Motion for Summary Judgment.[13] (Dkt. 114.)

Date: 5/4/2017

_____
Virginia M. Kendall
United States District Court Judge

---

[13] The Court recognizes the excellent work of recruited pro bono counsel Christopher Letkewicz, J. Erik Connolly, and Ryan Hauer, of Winston & Strawn LLP, whose extensive work on this matter exemplifies the bar's fine tradition of pro bono service.